**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA FREEDOM CAUCUS, <br><br> *Plaintiff*, <br><br> v. <br><br> WALLACE H. JORDAN, JR., J. DAVID WEEKS, BETH E. BERNSTEIN, PAULA RAWL CALHOON, MICAJAH P. CASKEY, IV, NEAL A. COLLINS, JOHN RICHARD C. KING, ROBBY ROBBINS, J. TODD RUTHERFORD, AND LEONIDAS E. STAVRINAKIS, in their official capacities as members of the HOUSE OF REPRESENTATIVES LEGISLATIVE ETHICS COMMITTEE, <br><br> *Defendants*. | Civil Action No. 3:23-cv-00795-CMC <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Gene P. Hamilton*
Reed D. Rubinstein*
AMERICA FIRST LEGAL FOUNDATION
300 Independence Ave. SE
Washington, DC 20003
Tel: (202) 964-3721
reed.rubinstein@aflegal.org

*motion for admission
*pro hac vice* forthcoming

Christopher Mills (Fed. Bar No. 13432)
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
Tel: (843) 606-0640
cmills@spero.law

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Statutory Background ............................................................................................................. 2

Statement of Undisputed Facts .............................................................................................. 4

Legal Standard ....................................................................................................................... 5

Argument ................................................................................................................................ 6

    I.    South Carolina's discriminatory speech ban violates the U.S. Constitution. ...................... 6

        A.    The law bans protected speech based on viewpoint and content. ............................... 6

        B.    The speech ban violates the Equal Protection Clause. ................................................ 12

        C.    The speech ban cannot satisfy strict scrutiny. ........................................................... 12

            1.    The Defendants cannot show any compelling government interest. .................... 13

            2.    The Defendants cannot show that banning speech is the least restrictive means of furthering any compelling interest. ........................................................ 15

        D.    The speech ban cannot survive any level of scrutiny. ................................................ 17

    II.    Permanent injunctive relief is required. ............................................................................. 18

Conclusion .............................................................................................................................. 20

## INTRODUCTION

This case presents a straightforward First Amendment violation. South Carolina bans legislative caucuses formed by certain speakers from engaging in core political speech, even as it permits favored caucuses—those formed around party, race, or gender—to engage in that speech. The favored caucuses may campaign, solicit funds, and otherwise speak. All other legislative caucuses are banned from "engag[ing] in any activity that would influence the outcome of an election or ballot measure." S.C. Code Ann. § 2-17-10(21). That stunningly broad prohibition means that disfavored caucuses cannot engage in political speech or raise money except for the narrowest of purposes—mailing expenses and conferences. If they speak, they are subject to criminal penalties. Thus, the House Republican Caucus may speak, while the Freedom Caucus may not. The House Democratic Caucus may speak, but not the Progressive Caucus. The Black Caucus and the Women's Caucus may speak, but not the Family, Pride, or Jewish Caucuses.

"[T]he First Amendment stands against [such] attempts to disfavor certain subjects or viewpoints." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). It prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Id*. Prohibiting speech "based on the specific motivating ideology or the opinion or perspective of the speaker" is "blatant[ly]" unconstitutional viewpoint discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (cleaned up). Because South Carolina's law imposes a content- and viewpoint-based speech ban that discriminates against disfavored speech, it is presumptively unconstitutional under the First and Fourteenth Amendments. And the State cannot pass strict (or any) scrutiny when it permits favored caucuses to engage in the same speech that the Plaintiff seeks here. The Court should grant summary judgment and issue a permanent injunction requiring the Defendants to treat special interest caucuses the same as other legislative caucuses.

## STATUTORY BACKGROUND

South Carolina law defines a "legislative caucus" as "a committee of either house of the General Assembly controlled by the caucus of a political party or a caucus based upon racial or ethnic affinity, or gender" or "a party or group of either house of the General Assembly based upon racial or ethnic affinity, or gender." S.C. Code Ann. § 2-17-10(11). The definition specifically "does not include a 'legislative special interest caucus,'" *id.*, which "means two or more legislators who seek to be affiliated based upon a special interest." *Id.* § 10(21); *see also* S.C. Code Ann. § 8-13-1300(21).

A party-, race-, or gender-based caucus may engage in extensive political speech and raise money for that speech. Such caucuses may solicit and receive $3,500 from every person in the country. *Id.* §§ 1322, 1333, 1300. Party caucuses may give $50,000 directly to a candidate, *id.* § 1316, and race- or gender-based caucuses can give $3,500 to a candidate, *id.* § 1314. These caucuses may also act as a clearinghouse for receiving and disbursing candidate funds. *Id.* § 1340. Contributors who gave more than $100 in a cycle must be disclosed. *Id.* § 1360(A)(4). And members of these favored caucuses can accept lodging, transportation, entertainment, food, and beverages by lobbyists' principals. S.C. Code Ann. § 2-17-90(A)(1); *see* Declaration of Christopher Mills, Ex. 1, House Ethics Advisory Opinion 93-30, p. 1 (Lobbyists' principals may "entertain legislative members when invited as part of the entire membership of," as relevant, "those caucuses based on racial or ethnic affinity, gender, or political party.").[1] The favored caucuses can spend unlimited sums on elections and ballot measures. Even for express advocacy within 45 days of an election, "there is no limit on how much" favored caucuses can spend, and

---

[1] The House and Senate Ethics Committees have statutory authority to issue advisory opinions, which are generally "binding on the committee[s]" and "must be made available to the public." S.C. Code Ann. § 8-13-535.

they "do[] not have to report as contributions the funds" "for such communications." Mills Decl., Ex. 2, House Ethics Advisory Opinion 2006-1, p. 1.

Disfavored caucuses, on the other hand—those based on interests other than party, race, or gender—may not "engage in any activity that would influence the outcome of an election or ballot measure." S.C. Code Ann. § 2-17-10(21). This sweeping prohibition bans *all* speech and spending on elections or ballot measures, and even speech that might "influence" them. Disfavored caucuses may not "solicit contributions" except "for the limited purpose of defraying mailing expenses, including cost of materials and postage, and for members of the legislative special interest caucus to attend regional and national conferences." S.C. Code Ann. § 8-13-1333(C)(1). Permissible conferences are narrowly defined, as they must be "exclusively comprised of legislative special interest caucus counterparts" and not attended by "persons other than legislators." *Id.* Along with the ban on soliciting contributions, South Carolina law also forbids special interest caucuses from "accept[ing] a gift, loan, or anything of value." *Id.* § 1333(C)(2). Nor may lobbyists offer their members "contributions or any other type of funds or financial assistance." S.C. Code Ann. § 2-17-110(J). And these caucuses must disclose *all* "donation[s]" and "expenses," regardless of their amount. S.C. Code Ann. § 8-13-1333(C)(1)(b), (c).

In the words of both the House and Senate Legislative Ethics Committees, in advisory opinions warning members considering joining special interest caucuses, "[t]hese statutes specifically and expressly limit the activities of a legislative special interest caucus and its members." Mills Decl., Ex. 3, Senate Ethics Advisory Opinion 2016-1, p. 2; Mills Decl., Ex. 4, House Ethics Advisory Opinion 2017-13, p. 3. Favored caucuses, meanwhile, remain free to speak and engage in the political process.

The House Legislative Ethics Committee enforces these rules with investigations, hearings, sanctions, and referrals for criminal prosecution. S.C. Code Ann. § 8-13-530. If the Committee finds that a violation has occurred, it may "administer a public reprimand," "require the respondent to pay a civil penalty," "recommend expulsion of the member," and refer for criminal prosecution. *Id.* § 540(D)(6)(c); *see* S.C. House of Representatives Rule 4.16(F) (same). A violation is a misdemeanor punishable by a one-year imprisonment and a fine. S.C. Code Ann. § 8-13-1520(A); *see* S.C. Code Ann. § 2-17-130. Violators are also subject to other fines administered by the Committee. S.C. Code Ann. § 8-13-130.

## STATEMENT OF UNDISPUTED FACTS

1.    South Carolina statutes "specifically and expressly limit" the expressive "activities of a legislative special interest caucus and its members" beyond the limitations imposed on legislative caucuses based on political party, racial or ethnic affinity, or gender. Mills Decl., Ex. 4, House Ethics Advisory Opinion 2017-13, p. 3; *see* S.C. Code Ann. § 2-17-10(11), (21).

2.    The South Carolina Freedom Caucus is a legislative special interest caucus comprised of members of the South Carolina House of Representatives. The Caucus seeks to promote conservative principles like the rule of law and equal protection for all citizens under the law. The chairman of the Caucus is Rep. Adam Morgan, and the vice-chairman is Rep. RJ May. Declaration of Representative Adam M. Morgan ¶ 2.

3.    If not for South Carolina's discriminatory speech ban on legislative special interest caucuses and the threat of criminal penalties and other sanctions, the Freedom Caucus would speak on political issues, including speech that may influence elections and ballot measures. The Freedom Caucus would also solicit contributions and make expenditures to support such speech.

The Freedom Caucus would also make contributions supporting candidates or ballot measures. Morgan Decl. ¶ 5.

4.      South Carolina's discriminatory speech ban on legislative special interest caucuses imposes a present and ongoing chill on the Freedom Caucus's speech. In the last six weeks, Freedom Caucus members have been repeatedly subjected to misleading anonymous attacks. If not for South Carolina's bans on special interest caucus speech, expenditures, and contributions, the Freedom Caucus could and would more effectively respond to these attacks. But because South Carolina severely hampers the Caucus's right to speak (including soliciting support for its speech), the Freedom Caucus cannot mount an effective, coordinated response to the scurrilous attacks against its members. Nor can it engage in speech about campaigns and candidates, which it would do but for South Carolina's ban. Morgan Decl. ¶ 6.

5.      Defendants, in their official capacities as members of the House Legislative Ethics Committee, have authority to enforce South Carolina's statutory limitations on legislative special interest caucuses with investigations, hearings, public reprimands, civil penalties, referrals for criminal prosecution, and other sanctions. S.C. Code Ann. §§ 8-13-530, 540; *see* Morgan Decl. ¶ 4.

6.      A judicial order enjoining enforcement by the Defendants of South Carolina's discriminatory restrictions on special interest caucuses would enable the Plaintiff to engage in more effective political speech, and it would do so if such an order were entered in this case. Morgan Decl. ¶ 8.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (cleaned up).

## ARGUMENT

### I. South Carolina's discriminatory speech ban violates the U.S. Constitution.

South Carolina's discriminatory ban on legislative special interest caucus speech contradicts the First Amendment. It imposes impermissible viewpoint- and content-based discrimination. That discrimination also violates the Equal Protection Clause of the Fourteenth Amendment. Because the law operates as an outright political speech ban *and* discriminates on viewpoint, the Court need not consider supposed justifications. Regardless, under the strict scrutiny that applies (at least) to the speech, solicitation, and expenditure bans on special interest caucuses, the State cannot meet its burden of showing any compelling interest or the least restrictive means of furthering such an interest; the government has no legitimate interest in suppressing some speech while elevating other speech, and its permission slip for favored caucuses to speak eliminates any possibility that some interest of the highest order is at stake or that the law is narrowly tailored. For the same reasons, the contribution "limits" of the law—all $0 for special interest caucuses—fail exacting scrutiny. The law is "an outright ban, backed by criminal sanctions"; such laws are "classic examples of censorship." *Citizens United*, 558 U.S. at 337. The law is unconstitutional.

### A. The law bans protected speech based on viewpoint and content.

South Carolina law prohibits disfavored groups from engaging in political speech at the core of the First Amendment. There is no question that the banned speech is constitutionally protected. In fact, speech pertaining to elections "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995); *see also*

*Grimmett v. Freeman*, 59 F.4th 689, 695 n.8 (4th Cir. 2023) ("First Amendment concerns are at their 'zenith' when a law regulates 'core political speech.'" (cleaned up)); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates.").

The law's restrictions on solicitations, expenditures, and contributions also implicate core speech rights. "[C]ontribution and expenditure limitations [on political speech] operate in an area of the most fundamental First Amendment activities"—only amplified by the fact that "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 14, 19 (1976); *see Randall v. Sorrell*, 548 U.S. 230, 246 (2006) (plurality opinion) ("[C]ontribution limits, like expenditure limits, implicate fundamental First Amendment interests, namely, the freedoms of political expression and political association." (cleaned up)); *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression."); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442–43 (2015) (applying strict scrutiny to a law "restricting the solicitation of contributions" to fund "speech about public issues"). In short, "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (plurality opinion).

Because South Carolina's law operates as "a ban on speech," it is necessarily invalid. *Citizens United*, 558 U.S. at 339. As discussed, "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," and "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Id.* at 339–

40 (cleaned up). "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Id.* at 339. By outright banning speech about elections and ballot measures, South Carolina law violates the First Amendment. *See id.* at 340.

The law's viewpoint discrimination confirms its unconstitutionality. "It is axiomatic . . . that the government may not regulate speech based on its substantive content or the message it conveys." *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)). Giving some speakers preferential treatment "deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Citizens United*, 558 U.S. at 340–41. It also "deprive[s] the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* at 341. The First Amendment thus prohibits government efforts to control "the relative ability of individuals and groups to influence the outcome of elections." *Id.* at 350.

As case after case holds, the government may not impose speech restrictions based on the identity or motivation of the speaker, for such restrictions necessarily discriminate based on the speaker's viewpoint. Restricting speech "based on the specific motivating ideology or the opinion or perspective of the speaker" is "blatant[ly]" unconstitutional viewpoint discrimination. *Reed*, 576 U.S. at 168 (cleaned up); *see, e.g.*, *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1593 (2022) (explaining that it is "impermissible viewpoint discrimination" to "exclude speech based on [a particular] viewpoint" (cleaned up)); *Rosenberger*, 515 U.S. at 831 (excluding a certain "political, economic, or social viewpoint" is viewpoint discrimination); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001) (excluding speech "based on [the organizational speaker's] religious nature" is viewpoint discrimination); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508

U.S. 384, 394 (1993) (viewpoint discrimination to exclude speech on "a subject otherwise permissible" because it comes "from a [particular] standpoint"); *Child Evangelism Fellowship*, 470 F.3d at 1068 (explaining that "it constitutes viewpoint discrimination" to bar certain "perspectives on otherwise permitted subjects"); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 624 n.11 (4th Cir. 2002) ("[G]iven a properly defined subject matter, the government is presumptively unable to discriminate among viewpoints about that subject matter.").

South Carolina law facially discriminates in favor of speakers identified with or motivated by political party, race, or gender. Speakers with other identities or motivations may not speak about elections through a caucus. Putting South Carolina law's operation in practical terms confirms its viewpoint-based discrimination. As noted, the House Republican Caucus (and Democratic Caucus) may speak about elections and ballot measures, while the Freedom Caucus (and the Progressive Caucus) may not. The Women's Caucus may solicit money to fund electioneering, while a religious caucus could not. And, of course, that "multiple voices are silenced" does not eliminate the viewpoint discrimination, but means that the law "skew[s]" "the complex and multifaceted nature of public discourse" protected by the First Amendment in "multiple ways." *Rosenberger*, 515 U.S. at 831–32. Under the First Amendment, "minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). And "the legislature is constitutionally disqualified from dictating which speakers may address a public issue." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 2023 WL 2172219, at *9 (4th Cir. Feb. 23, 2023) (cleaned up).

Compounding the ban's unconstitutionality is its discrimination against collective speech—*i.e.*, association. South Carolina law generally permits individual legislators to engage in speech, solicit contributions, and make expenditures. "To place a Spartan limit—or indeed any limit—on individuals wishing to band together to advance their views," "while placing none on individuals acting alone, is clearly a restraint on the right of association." *Citizens Against Rent Control*, 454 U.S. at 296. After all, "[t]he First Amendment protects [individuals'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988). And "implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up); *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006) ("The right to speak is often exercised most effectively by combining one's voice with the voices of others."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority."); *Citizens Against Rent Control*, 454 U.S. at 296 ("[T]he freedom of association is diluted if it does not include the right to pool money through contributions, for funds are often essential if advocacy is to be truly or optimally effective." (cleaned up)); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958) (An association is "the medium through which its individual members seek to make more effective the expression of their own views.").[2]

---

[2] It makes no difference that legislative caucuses are a creation of state law: states are not "free to define the rights of their creatures without constitutional limit." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 778 n.14 (1978); *see, e.g.*, *Citizens United*, 558 U.S. at 351 ("It is rudimentary that the State cannot exact as the price of" organizing a group "the forfeiture of First Amendment rights." (cleaned up)); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 533–34 (1980) (rejecting proposition that entity's "heavily regulated" status deprived it of First Amendment rights).

Both because the law bans political speech and because it discriminates based on viewpoint, it violates the First Amendment without further inquiry. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and *those based on viewpoint are prohibited*." (emphasis added)); *accord Child Evangelism Fellowship*, 470 F.3d at 1074 (striking down a similar discriminatory exclusion without applying strict scrutiny).

Even if the law's exclusion were "only" content-based, or were otherwise subject to strict scrutiny rather than being outright invalid, the State's discrimination would fail strict scrutiny for the reasons explained in Part I.C *infra*. Along with banning speech and discriminating against speech based on viewpoint, South Carolina law discriminates based on content. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340. As explained, disfavored caucuses may not engage in speech "that would influence the outcome of an election or ballot measure." S.C. Code Ann. § 2-17-10(21). And they may not raise funds to engage in speech unless it is the speech permitted by the State—*e.g.*, sending mailings without any connection to an election. S.C. Code Ann. § 8-13-1333(C)(1). "That is textbook content discrimination." *Grimmett*, 59 F.4th at 694. Thus, at minimum, strict scrutiny applies to the law because it discriminates based on content. *See Reed*, 576 U.S. at 165 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." (cleaned up)).

### B. The speech ban violates the Equal Protection Clause.

Another reason exists for applying (at least) strict scrutiny. The Fourteenth Amendment prohibits states from enforcing "any law which shall abridge the privileges or immunities of a citizen of the United States" and from denying "to any person within its jurisdiction the equal protection of the laws." The Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "When an alleged equal protection violation is based on a First Amendment claim," courts "fuse[] the First Amendment into the Equal Protection Clause." *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) (cleaned up). "There is an equality of status in the field of ideas, and government must afford all points of view an equal opportunity to be heard." *Carey v. Brown*, 447 U.S. 455, 463 (1980) (cleaned up). As explained, South Carolina does the opposite, permitting favored groups to speak and prohibiting disfavored ones from speaking. "When government regulation discriminates among speech-related activities" like this, "the Equal Protection Clause mandates that the legislation" pass strict scrutiny. *Id.* at 461; *see also Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019) ("[W]e apply strict scrutiny under the Equal Protection Clause where (as here) the challenged action interferes with a fundamental right."). As shown next, the State cannot satisfy such scrutiny.

### C. The speech ban cannot satisfy strict scrutiny.

Discriminatory regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed,* 576 U.S. at 163; *see Comm'r*, 288 F.3d at 626. This strict scrutiny standard also applies to the law's expenditure and solicitation bans. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011); *Williams-Yulee*, 575 U.S. at 442–43. Requiring the government "to demonstrate a compelling interest and show that it has adopted the least restrictive

means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

To satisfy this test, the Defendants must first show that the law "plainly serves compelling state interests of the highest order" and is "unrelated to the suppression of expression." *Jaycees*, 468 U.S. at 624. This "stringent standard is not watered down but really means what it says." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020) (cleaned up). Then, the Defendants must demonstrate *specifically* that "application of the [legal] burden to the person represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (cleaned up). The Defendants must also "specifically identify an actual problem" and show that restricting "speech [is] actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). The Defendants cannot meet any of these burdens here, much less all of them.

### 1. The Defendants cannot show any compelling government interest.

The Defendants have a heavy burden to show a compelling interest: "only the gravest abuses, endangering paramount interest, give occasion for permissible limitation" on a "First Amendment right." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (cleaned up). And the Defendants must show a compelling interest in enforcing the law against the Plaintiff specifically, rather than merely a general interest. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). "A law does not advance an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Espinoza*, 140 S. Ct. at 2261 (cleaned up); *see Reed*, 576 U.S. at 172 (same); *Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 170 (4th Cir. 2019) (same).

South Carolina's speech ban fails strict scrutiny at the outset because it serves no legitimate interest at all, and instead is solely concerned with "the suppression of expression." *Jaycees*, 468

U.S. at 624. The State permits speech and expenditures for speech, as long as the speech comes from a handful of approved viewpoints. Otherwise, the law—and this is its only point—suppresses expression. Suppressing expression is neither a compelling nor a legitimate government interest. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) ("[T]he First Amendment's purpose" is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." (cleaned up)). Indeed, Plaintiff is unaware of *any* recognized compelling interest that could justify South Carolina's flat ban on political speech.

Even when it comes to restricting campaign contributions, the Supreme Court "has identified only one legitimate governmental interest": "preventing corruption or the appearance of corruption," and "Congress may target only a specific type of corruption—'*quid pro quo*' corruption" stemming from "large individual financial contributions to particular candidates." *McCutcheon*, 572 U.S. at 206–07 (cleaned up); *see id.* at 208 (explaining that limiting who "may garner 'influence over or access to' elected officials" is *not* a qualifying government interest).[3] South Carolina's speech ban could not be justified by an interest in avoiding *quid pro quo* corruption, even putting aside that a caucus is not a candidate. The ban is vastly overinclusive because it flatly bans *all* speech (and contributions and expenditures). At the same time, it is fatally underinclusive with respect to any claimed goals. "As the Supreme Court has recognized," "'underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Grimmett*, 59 F.4th at 696 n.9 (cleaned up) (quoting *Williams-Yulee*, 575 U.S. at 448). Whatever interest the Defendants might put forward, they cannot explain why letting favored caucuses speak and raise money (and

---

[3] This interest could not justify the law's ballot measure restrictions: "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299.

be wined and dined by lobbyists, *supra* p. 2) does not equally implicate its supposed interest. Favored caucuses do not even have to *report* contributions used for express advocacy within 45 days of an election. *Supra* pp. 2–3. Nor can the Defendants "specifically identify an actual problem" with caucuses arranged around interests other than party, race, or gender. *Brown*, 564 U.S. at 799 (cleaned up).

As Defendant Caskey recently admitted when trying to explain why only party, race, and gender caucuses may speak: "I don't know, frankly." Mills Decl., Ex. 5, p. 2. Thus, the Defendants themselves seem to recognize that South Carolina's discriminatory speech ban is not connected to any compelling interest. It simply prohibits speech from certain viewpoints. That is unconstitutional.

### 2. The Defendants cannot show that banning speech is the least restrictive means of furthering any compelling interest.

The Defendants will also fail to meet the "exceptionally demanding" least-restrictive-means test. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Under this test, if a less restrictive alternative would serve the government's purpose, the government "*must* use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (emphasis added). And it is a "nonnegotiable requirement in this Circuit" that "actual evidence in the legislative record [demonstrates] that lesser restrictions will not do." *People for the Ethical Treatment of Animals*, 2023 WL 2172219, at *9 (cleaned up). "Before a State may pass such expansive speech restrictions, this Circuit's precedent requires it to *produce* evidence demonstrating that it seriously undertook to utilize existing laws or attempted to use less intrusive tools readily available to it to achieve the proffered aims." *Id.* at *10 (cleaned up).

First, the Defendants have no such evidence. "Precision must be the touchstone when it comes to regulations of speech." *Nat'l Inst. of Fam. and Life Advocates v. Becerra*, 138 S. Ct.

2361, 2376 (2018) (cleaned up). "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the [State] thought to try." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). Rather than take the obvious route of applying the same disclosure rules and financial limits to special interest caucuses that apply to favored caucuses, the State banned disfavored caucuses from speaking at all. *Cf. McCutcheon*, 572 U.S. at 223 ("[D]isclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech."). The Defendants have no evidence to support this draconian, irrational approach; indeed, they "don't know" why it exists. Mills Decl., Ex. 5, p. 2. And the Defendants have no evidence to show that the ban must be applied specifically to the Plaintiff to advance some governmental interest of the highest order. *See O Centro*, 546 U.S. at 423 (requiring the defendant to specifically show that "application of the [legal] burden to the person represents the least restrictive means").

Second and again, whatever interests the Defendants might assert, the fact that the State allows favored caucuses to speak, solicit, and spend money in ways that special interest caucuses may not proves that banning the disfavored caucuses' speech is not the least restrictive means of furthering any interest. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (underinclusiveness suggests the government's "interests could be achieved by narrower [policies]"); *Cahaly v. Larosa*, 796 F.3d 399, 405–06 (4th Cir. 2015) (similar). Whatever interests the State may have in preventing corruption or providing disclosure are evidently addressed by the legal regime that applies to favored caucuses. "In light of this underinclusiveness," the Defendants cannot meet their "burden to prove that [the law] is narrowly tailored." *Reed*, 576 U.S. at 172. Thus, the speech ban flunks strict scrutiny.

**D. The speech ban cannot survive any level of scrutiny.**

For the same reasons, the speech ban would flunk even lesser scrutiny. Under the heightened scrutiny that courts have applied to contribution limits, the Defendants must show that "the restriction at issue [is] closely drawn to serve a sufficiently important interest." *Bennett*, 564 U.S. at 735 (cleaned up); *see McCutcheon*, 572 U.S. at 218 (requiring "a means narrowly tailored to achieve the desired objective"). And again, "the governmental interest" must be "unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). But as explained above, the State's interests are founded on speech suppression. And an over- and underinclusive ban on speech from certain speakers is neither tied to a substantial interest nor a closely drawn way of furthering such an interest. Whatever interests the Defendants might assert are equally implicated by caucuses organized by party, gender, or race; this "substantial mismatch between" alleged interests "and the means selected to achieve [them]" means that the law "fail[s]" "under the 'closely drawn' test." *McCutcheon*, 572 U.S. at 199. Likewise, the $0 contribution limits for disfavored caucuses show "that they are not closely drawn" and instead "fall outside tolerable First Amendment limits." *Sorrell*, 548 U.S. at 249, 253; *see McCutcheon*, 572 U.S. at 210 (emphasizing the lack of tailoring for a provision that "ban[ned] all contributions of *any* amount"); *Green Party of Conn. v. Garfield*, 616 F.3d 189, 206 (2d Cir. 2010) ("[A] contribution ban utterly eliminates an individual's right to express his or her support for a candidate by contributing money to the candidate's cause."); *see also supra* pp. 14–16 (explaining why any asserted anticorruption interest would fail). Indeed, South Carolina's ban flunks even rational basis review, for the State has no legitimate interest in suppressing disliked speech. Thus, the Defendants cannot pass any level of scrutiny.

To be clear, the Plaintiff is not challenging South Carolina's campaign finance regulations of legislative caucuses writ large. Instead, all that the Plaintiff seeks is the ability to speak—

including soliciting, spending, and making contributions—on the same terms as the legislative caucuses organized around party, race, or gender. South Carolina's law banning speech based on viewpoint violates the First and Fourteenth Amendments.

## II. Permanent injunctive relief is required.

A permanent injunction is required because (1) the Plaintiff has suffered and continues to suffer an irreparable injury; (2) no other remedy at law redresses that injury; and (3) the balance of interests and public interest favor constitutional rights. *See Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011). Without injunctive relief, the Defendants could—and are likely to—continue violating the First Amendment rights of the Plaintiff. This Court should accordingly exercise its discretion and grant a permanent injunction.

*First*, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002). A mere "credible threat" of prosecution constitutes a First Amendment injury, and courts presume "that a 'non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)). Systematic suppression of speech made by caucuses not organized around the State's favored subjects—party, race, or gender—is enshrined in South Carolina law. In other words, "the statute facially restricts expressive activity by the class to which the [P]laintiff belongs"—which is enough for a First Amendment injury. *Bartlett*, 168 F.3d at 710 (cleaned up); *see id.* at 711 ("[T]he statute's mere existence risks chilling First Amendment rights.").

Independently, the Plaintiff's protected speech is in fact chilled. "Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013). The Plaintiff "has

stated that it wants to" engage in collective political speech, including about elections, "and would do so but for its fear that it would" be subject to enforcement actions by the Defendants. *Bartlett*, 168 F.3d at 710; *see* Morgan Decl. ¶¶ 5–6. Given not only the statute's plain text but also the Defendants' recent advisory opinions threatening enforcement of relevant provisions, *see* Mills Decl., Ex. 4, House Ethics Advisory Opinion 2017-13, p. 3, "that fear [i]s well-founded." *Bartlett*, 168 F.3d at 710. The Plaintiff's "showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression," is another "ongoing injury" under the First Amendment. *Kenny*, 885 F.3d at 288 (cleaned up).

Last, "being subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (cleaned up). It is illegal for the Plaintiff to share its speech on an equal footing with other caucuses, which is another irreparable injury that justifies a permanent injunction. Injunctive relief is the only way to protect the speech of the Plaintiff and ensure that it will not face discriminatory investigations and sanctions for its speech.

*Second*, there is no adequate remedy at law for the deprivation of the Plaintiff's right to speak. "[M]onetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club*, 637 F.3d at 302. The declaratory and injunctive relief sought here is the only remedy for the muzzle South Carolina law has imposed on the Plaintiff's speech.

*Third*, the balance of hardships and public interests—which merge when the government is a party—favor an injunction. *See Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020). The State has inflicted a stark hardship on the Plaintiff: the loss of its First Amendment rights. And the Defendants are "in no way harmed" by an injunction that prevents the enforcement of an unconstitutional burden on protected speech. *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Again, the Plaintiff makes a simple request—that the State leave it the same

ability to speak as other caucuses. And because of how vital constitutional freedoms are to public life, the public is always served by the protection of First Amendment rights. *See Legend Night Club*, 637 F.3d at 303 ("[I]t is always in the public interest to protect First Amendment liberties." (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)); *Newsom*, 354 F.3d at 261 ("Surely, upholding constitutional rights serves the public interest."). Though the State has arbitrarily decided that speech stemming from party, racial, or gender affiliation is more valuable than speech stemming from concern over policy issues, the public is disserved when it is sequestered from the free marketplace of ideas. *Cf. Citizens United*, 558 U.S. at 356 (explaining that it "is unlawful" for the government to "use[] censorship to control thought" by "command[ing] where a person may get his or her information or what distrusted source he or she may not hear"); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas.").

## CONCLUSION

"If the First Amendment has any force, it prohibits [the government] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United*, 558 U.S. at 349. For these reasons, the Court should grant the motion for summary judgment, declare that South Carolina's legislative special interest caucus speech limitations violate the First and Fourteenth Amendments of the U.S. Constitution, and permanently enjoin Defendants from enforcing these discriminatory speech restrictions, including those found in S.C. Code Ann. §§ 2-17-10(21), 2-17-110(J), and 8-13-1333(C).

Respectfully submitted,

/s/ Christopher Mills

| | |
|---|---|
| Gene P. Hamilton (motion for admission *pro hac vice* forthcoming) | Christopher Mills (Fed. Bar No. 13432) |

Gene P. Hamilton (motion for admission
   *pro hac vice* forthcoming)
Reed D. Rubinstein (motion for admission
   *pro hac vice* forthcoming)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Ave. SE
Washington, DC 20003
Tel: (202) 964-3721
reed.rubinstein@aflegal.org

Christopher Mills (Fed. Bar No. 13432)
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
Tel: (843) 606-0640
cmills@spero.law

*Counsel for Plaintiff*

March 15, 2023