**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA FREEDOM CAUCUS,<br>*Plaintiff*,<br><br>v.<br><br>WALLACE H. JORDAN, JR., J. DAVID WEEKS, BETH E. BERNSTEIN, PAULA RAWL CALHOON, MICAJAH P. CASKEY, IV, NEAL A. COLLINS, JOHN RICHARD C. KING, ROBBY ROBBINS, J. TODD RUTHERFORD, AND LEONIDAS E. STAVRINAKIS, in their official capacities as members of the HOUSE OF REPRESENTATIVES LEGISLATIVE ETHICS COMMITTEE,<br>*Defendants*. | Civil Action No. 3:23-cv-00795-CMC<br><br>**[PROPOSED]<br>SUMMARY JUDGMENT ORDER** |

**INTRODUCTION**

This case challenges the speech limitations imposed by South Carolina law on special interest legislative caucuses. South Carolina law defines a "legislative caucus" as "a committee of either house of the General Assembly controlled by the caucus of a political party or a caucus based upon racial or ethnic affinity, or gender" or "a party or group of either house of the General Assembly based upon racial or ethnic affinity, or gender." S.C. Code Ann. § 2-17-10(11). The definition specifically "does not include a 'legislative special interest caucus,'" *id.*, which "means two or more legislators who seek to be affiliated based upon a special interest." *Id.* § 10(21); *see also* S.C. Code Ann. § 8-13-1300(21).

A party-, race-, or gender-based caucus may engage in extensive political speech and raise money for that speech. Such caucuses may solicit and receive $3,500 from every person in the country. *Id.* §§ 1322, 1333, 1300. Party caucuses may give $50,000 directly to a candidate, *id.* § 1316, and race- or gender-based caucuses can give $3,500 to a candidate, *id.* § 1314. These caucuses may also act as a clearinghouse for receiving and disbursing candidate funds. *Id.* § 1340.

Contributors who gave more than $100 in a cycle must be disclosed. *Id.* § 1360(A)(4). And members of these favored caucuses can accept lodging, transportation, entertainment, food, and beverages by lobbyists' principals. S.C. Code Ann. § 2-17-90(A)(1); *see* House Ethics Advisory Opinion 93-30, p. 1 (Lobbyists' principals may "entertain legislative members when invited as part of the entire membership of," as relevant, "those caucuses based on racial or ethnic affinity, gender, or political party.").[1] The favored caucuses can spend unlimited sums on elections and ballot measures. Even for express advocacy within 45 days of an election, "there is no limit on how much" favored caucuses can spend, and they "do[] not have to report as contributions the funds" "for such communications." House Ethics Advisory Opinion 2006-1, p. 1.

Disfavored caucuses, on the other hand—those based on interests other than party, race, or gender—may not "engage in any activity that would influence the outcome of an election or ballot measure." S.C. Code Ann. § 2-17-10(21). This prohibition bans *all* speech and spending on elections or ballot measures, and even speech that might "influence" them. Disfavored caucuses may not "solicit contributions" except "for the limited purpose of defraying mailing expenses, including cost of materials and postage, and for members of the legislative special interest caucus to attend regional and national conferences." S.C. Code Ann. § 8-13-1333(C)(1). Permissible conferences are narrowly defined, as they must be "exclusively comprised of legislative special interest caucus counterparts" and not attended by "persons other than legislators." *Id.* Along with the ban on soliciting contributions, South Carolina law also forbids special interest caucuses from "accept[ing] a gift, loan, or anything of value." *Id.* § 1333(C)(2). Nor may lobbyists offer their

---

[1] The House and Senate Ethics Committees have statutory authority to issue advisory opinions, which are generally "binding on the committee[s]" and "must be made available to the public." S.C. Code Ann. § 8-13-535. The Court takes judicial notice of these opinions, *see* Fed. R. Evid. 201, though no conclusion in this order turns on them.

2

members "contributions or any other type of funds or financial assistance." S.C. Code Ann. § 2-17-110(J). And these caucuses must disclose *all* "donation[s]" and "expenses," regardless of their amount. S.C. Code Ann. § 8-13-1333(C)(1)(b), (c).

The House Legislative Ethics Committee enforces these rules with investigations, hearings, sanctions, and referrals for criminal prosecution. *Id.* § 530. If the Committee finds that a violation has occurred, it may "administer a public reprimand," "require the respondent to pay a civil penalty," "recommend expulsion of the member," and refer for criminal prosecution. *Id.* § 540(D)(6)(c); *see* S.C. House of Representatives Rule 4.16(F) (same). A violation is a misdemeanor punishable by a one-year imprisonment and a fine. S.C. Code Ann. § 8-13-1520(A); *see* S.C. Code Ann. § 2-17-130. Violators are also subject to other fines administered by the Committee. S.C. Code Ann. § 8-13-130. The Defendants are the current members of the Committee, sued in their official capacities.

Plaintiff South Carolina Freedom Caucus is a legislative special interest caucus comprised of members of the South Carolina House of Representatives. The Caucus's mission is to promote conservative principles like the rule of law and equal protection for all citizens. As a legislative special interest caucus, the Caucus is subject to the speech limitations discussed above. Because of those limitations and their stifling of the Caucus's speech, the Caucus filed suit and now moves for summary judgment and a permanent injunction enjoining the Defendants from treating special interest caucuses differently from other legislative caucuses.

## ANALYSIS

I. **South Carolina's ban on legislative special interest caucus speech violates the First and Fourteenth Amendments.**

South Carolina's prohibition on legislative special interest caucuses "engag[ing] in any activity that would influence the outcome of an election or ballot measure" implicates core First

3

Amendment rights. S.C. Code Ann. § 2-17-10(21). Speech pertaining to elections "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995); *see also Grimmett v. Freeman*, 59 F.4th 689, 695 n.8 (4th Cir. 2023) ("First Amendment concerns are at their 'zenith' when a law regulates 'core political speech.'" (cleaned up)); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates.").

South Carolina's related restrictions on legislative special interest caucus solicitations, expenditures, and contributions also implicate core speech rights. "[C]ontribution and expenditure limitations [on political speech] operate in an area of the most fundamental First Amendment activities"—only amplified by the fact that "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 14, 19 (1976); *see Randall v. Sorrell*, 548 U.S. 230, 246 (2006) (plurality opinion) ("[C]ontribution limits, like expenditure limits, implicate fundamental First Amendment interests, namely, the freedoms of political expression and political association." (cleaned up)); *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression."); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442–43 (2015) (applying strict scrutiny to a law "restricting the solicitation of contributions" to fund "speech about public issues"). In short, "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (plurality opinion).

By prohibiting special interest caucuses from engaging in election-related speech, making expenditures for that speech, and soliciting contributions for that speech, South Carolina's law

4

operates as "a ban on speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). As discussed, "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," and "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Id.* at 339–40 (cleaned up). "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Id.* at 339. "Laws that burden political speech" are (at least) "subject to strict scrutiny." *Id.* at 340 (cleaned up).

The law's viewpoint discrimination confirms that strict scrutiny applies. "It is axiomatic . . . that the government may not regulate speech based on its substantive content or the message it conveys." *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)). Giving some speakers preferential treatment "deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Citizens United*, 558 U.S. at 340–41. It also "deprive[s] the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* at 341. The First Amendment thus prohibits government efforts to control "the relative ability of individuals and groups to influence the outcome of elections." *Id.* at 350.

As case after case holds, the government may not impose speech restrictions based on the identity or motivation of the speaker, for such restrictions necessarily discriminate based on the speaker's viewpoint. Restricting speech "based on the specific motivating ideology or the opinion or perspective of the speaker" is "blatant[ly]" unconstitutional viewpoint discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (cleaned up); *see, e.g.*, *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1593 (2022) (explaining that it is "impermissible viewpoint discrimination" to

5

"exclude speech based on [a particular] viewpoint" (cleaned up)); *Rosenberger*, 515 U.S. at 831 (excluding a certain "political, economic, or social viewpoint" is viewpoint discrimination); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001) (excluding speech "based on [the organizational speaker's] religious nature" is viewpoint discrimination); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (viewpoint discrimination to exclude speech on "a subject otherwise permissible" because it comes "from a [particular] standpoint"); *Child Evangelism Fellowship*, 470 F.3d at 1068 (explaining that "it constitutes viewpoint discrimination" to bar certain "perspectives on otherwise permitted subjects"); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 624 n.11 (4th Cir. 2002) ("[G]iven a properly defined subject matter, the government is presumptively unable to discriminate among viewpoints about that subject matter.").

South Carolina law facially discriminates in favor of speakers identified with or motivated by political party, race, or gender. Speakers with other identities or motivations may not speak about elections through a caucus. Putting South Carolina law's operation in practical terms confirms its viewpoint-based discrimination. The House Republican Caucus (and Democratic Caucus) may speak about elections and ballot measures, while the Freedom Caucus (and a Progressive Caucus) may not. The Women's Caucus may solicit money to fund electioneering, while a religious caucus could not. And the fact that "multiple voices are silenced" does not eliminate the viewpoint discrimination, but means that the law "skew[s]" "the complex and multifaceted nature of public discourse" protected by the First Amendment in "multiple ways." *Rosenberger*, 515 U.S. at 831–32.

Under the First Amendment, "minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

6

And "the legislature is constitutionally disqualified from dictating which speakers may address a public issue." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 2023 WL 2172219, at *9 (4th Cir. Feb. 23, 2023) (cleaned up). "[T]he First Amendment stands against [such] attempts to disfavor certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340. It prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Id*. Because the law bans political speech based on viewpoint, it may well violate the First Amendment without further inquiry. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and *those based on viewpoint are prohibited*." (emphasis added)); *accord Child Evangelism Fellowship*, 470 F.3d at 1074 (striking down a similar discriminatory exclusion without applying strict scrutiny). In any event, as discussed below, the law cannot survive strict scrutiny.[2]

Strict scrutiny also applies because South Carolina's law impedes the freedom of association protected by the First Amendment. South Carolina law generally permits individual legislators to engage in speech, solicit contributions, and make expenditures. "To place a Spartan limit—or indeed any limit—on individuals wishing to band together to advance their views,"

---

[2] The same rule applies under the Plaintiff's Equal Protection Clause challenge. "When an alleged equal protection violation is based on a First Amendment claim," courts "fuse[] the First Amendment into the Equal Protection Clause." *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) (cleaned up). "There is an equality of status in the field of ideas, and government must afford all points of view an equal opportunity to be heard." *Carey v. Brown*, 447 U.S. 455, 463 (1980) (cleaned up). As explained, South Carolina does the opposite, permitting favored groups to speak and prohibiting disfavored ones from speaking. "When government regulation discriminates among speech-related activities" like this, "the Equal Protection Clause mandates that the legislation" pass strict scrutiny. *Id.* at 461; *see also Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019) ("[W]e apply strict scrutiny under the Equal Protection Clause where (as here) the challenged action interferes with a fundamental right.").

"while placing none on individuals acting alone, is clearly a restraint on the right of association." *Citizens Against Rent Control*, 454 U.S. at 296. After all, "[t]he First Amendment protects [individuals'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988). And "implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up); *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006) ("The right to speak is often exercised most effectively by combining one's voice with the voices of others."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority."); *Citizens Against Rent Control*, 454 U.S. at 296 ("[T]he freedom of association is diluted if it does not include the right to pool money through contributions, for funds are often essential if advocacy is to be truly or optimally effective." (cleaned up)); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958) (An association is "the medium through which its individual members seek to make more effective the expression of their own views.").[3]

Finally, the law's content-based triggers would independently trigger strict scrutiny. *See Reed*, 576 U.S. at 165 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the

---

[3] It makes no difference that legislative caucuses are a creation of state law: states are not "free to define the rights of their creatures without constitutional limit." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 778 n.14 (1978); *see, e.g.*, *Citizens United*, 558 U.S. at 351 ("It is rudimentary that the State cannot exact as the price of" organizing a group "the forfeiture of First Amendment rights." (cleaned up)); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 533–34 (1980) (rejecting proposition that entity's "heavily regulated" status deprived it of First Amendment rights).

ideas contained in the regulated speech." (cleaned up)). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340. As explained, disfavored caucuses may not engage in speech "that would influence the outcome of an election or ballot measure." S.C. Code Ann. § 2-17-10(21). And they may not raise funds to engage in speech unless it is the speech permitted by the State—*e.g.*, sending mailings without any connection to an election. S.C. Code Ann. § 8-13-1333(C)(1). "That is textbook content discrimination." *Grimmett*, 59 F.4th at 694.

Applying strict scrutiny, speech regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed,* 576 U.S. at 163; *see Comm'r*, 288 F.3d at 626. This strict scrutiny standard also applies to the law's expenditure and solicitation bans. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011); *Williams-Yulee*, 575 U.S. at 442–43. Requiring the government "to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

To satisfy this test, the Defendants must first show that the law "plainly serves compelling state interests of the highest order" and is "unrelated to the suppression of expression." *Jaycees*, 468 U.S. at 624. This "stringent standard is not watered down but really means what it says." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020) (cleaned up). Then, the Defendants must demonstrate *specifically* that "application of the [legal] burden to the person represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro*

9

*Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (cleaned up). The Defendants must also "specifically identify an actual problem" and show that restricting "speech [is] actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). The Defendants do not meet any of these burdens here.

South Carolina's speech ban fails strict scrutiny at the outset because it is solely concerned with "the suppression of expression." *Jaycees*, 468 U.S. at 624. That is neither a legitimate nor a compelling government interest. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) ("[T]he First Amendment's purpose" is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." (cleaned up)).

Even when it comes to restricting campaign contributions, the Supreme Court "has identified only one legitimate governmental interest": "preventing corruption or the appearance of corruption," and "Congress may target only a specific type of corruption—'*quid pro quo*' corruption" stemming from "large individual financial contributions to particular candidates." *McCutcheon*, 572 U.S. at 206–07 (cleaned up); *see id.* at 208 (explaining that limiting who "may garner 'influence over or access to' elected officials" is *not* a qualifying government interest).[4] South Carolina's speech ban could not be justified by an interest in avoiding *quid pro quo* corruption, even putting aside that a caucus is not a candidate. The ban is vastly overinclusive because it flatly bans *all* speech (and contributions and expenditures). At the same time, it is fatally underinclusive with respect to any claimed goals. "As the Supreme Court has recognized," "'underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Grimmett*, 59 F.4th at 696

---

[4] This interest could not justify the law's ballot measure restrictions: "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299.

n.9 (cleaned up) (quoting *Williams-Yulee*, 575 U.S. at 448). The Defendants cannot explain why letting favored caucuses speak and raise money (and be wined and dined by lobbyists) does not equally implicate whatever interests they assert. Favored caucuses do not even have to *report* contributions used for express advocacy within 45 days of an election. Nor can the Defendants "specifically identify an actual problem" with caucuses arranged around interests other than party, race, or gender. *Brown*, 564 U.S. at 799 (cleaned up). Thus, the Defendants cannot show that the ban implicates a compelling government interest.

The Defendants also fail to meet the "exceptionally demanding" least-restrictive-means test. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Under this test, if a less restrictive alternative would serve the government's purpose, the government "*must* use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (emphasis added). And it is a "nonnegotiable requirement in this Circuit" that "actual evidence in the legislative record [demonstrates] that lesser restrictions will not do." *People for the Ethical Treatment of Animals*, 2023 WL 2172219, at *9 (cleaned up). "Before a State may pass such expansive speech restrictions, this Circuit's precedent requires it to *produce* evidence demonstrating that it seriously undertook to utilize existing laws or attempted to use less intrusive tools readily available to it to achieve the proffered aims." *Id.* at *10 (cleaned up).

First, the Defendants have no such evidence. "Precision must be the touchstone when it comes to regulations of speech." *Nat'l Inst. of Fam. and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (cleaned up). "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the [State] thought to try." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). Rather than take the obvious route of applying the same disclosure rules and financial limits to special interest caucuses

11

that apply to favored caucuses, the State banned disfavored caucuses from speaking at all. *Cf. McCutcheon*, 572 U.S. at 223 ("[D]isclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech."). The Defendants have no evidence to support this draconian, irrational approach. And the Defendants have no evidence to show that the ban must be applied specifically to the Plaintiff to advance some governmental interest of the highest order. *See O Centro*, 546 U.S. at 423 (requiring the defendant to specifically show that "application of the [legal] burden to the person represents the least restrictive means").

Second and again, the fact that the State allows favored caucuses to speak, solicit, and spend money in ways that special interest caucuses may not proves that banning the disfavored caucuses' speech is not the least restrictive means of furthering any interest. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (underinclusiveness suggests the government's "interests could be achieved by narrower [policies]"); *Cahaly v. Larosa*, 796 F.3d 399, 405–06 (4th Cir. 2015) (similar). Whatever interests the State may have in preventing corruption or providing disclosure are evidently addressed by the legal regime that applies to favored caucuses. "In light of this underinclusiveness," the Defendants cannot meet their "burden to prove that [the law] is narrowly tailored." *Reed*, 576 U.S. at 172. Thus, the speech ban flunks strict scrutiny.

For similar reasons, the speech ban—including its contribution limits—flunks even lesser scrutiny. Under the heightened scrutiny that courts have applied to contribution limits, the Defendants must show that "the restriction at issue [is] closely drawn to serve a sufficiently important interest." *Bennett*, 564 U.S. at 735 (cleaned up); *see McCutcheon*, 572 U.S. at 218 (requiring "a means narrowly tailored to achieve the desired objective"). And again, "the governmental interest" must be "unrelated to the suppression of free expression." *United States v.*

12

*O'Brien*, 391 U.S. 367, 377 (1968). But as explained above, the State's interests are founded on speech suppression. And an over- and underinclusive ban on speech from certain speakers is neither tied to a substantial interest nor a closely drawn way of furthering such an interest. Whatever interests the State has are equally implicated by caucuses organized by party, gender, or race; this "substantial mismatch between" alleged interests "and the means selected to achieve [them]" means that the law "fail[s]" "under the 'closely drawn' test." *McCutcheon*, 572 U.S. at 199. Likewise, the $0 contribution limits for disfavored caucuses show "that they are not closely drawn" and instead "fall outside tolerable First Amendment limits." *Sorrell*, 548 U.S. at 249, 253; *see McCutcheon*, 572 U.S. at 210 (emphasizing the lack of tailoring for a provision that "ban[ned] all contributions of *any* amount"); *Green Party of Conn. v. Garfield*, 616 F.3d 189, 206 (2d Cir. 2010) ("[A] contribution ban utterly eliminates an individual's right to express his or her support for a candidate by contributing money to the candidate's cause."). Indeed, South Carolina's ban flunks even rational basis review, for the State has no legitimate interest in suppressing disliked speech. Thus, the Defendants cannot satisfy any level of scrutiny. The speech ban is unconstitutional.

## II.     Permanent injunctive relief is warranted.

A permanent injunction is appropriate because (1) the Plaintiff has suffered and continues to suffer an irreparable injury; (2) no other remedy at law redresses that injury; and (3) the balance of interests and public interest favor constitutional rights. *See Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011).

*First*, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002). A mere "credible threat" of prosecution constitutes a First Amendment injury, and courts presume "that a 'non-moribund statute that facially restricts expressive activity

by the class to which the plaintiff belongs presents such a credible threat.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)). Systematic suppression of speech made by caucuses not organized around the State's favored subjects—party, race, or gender—is enshrined in South Carolina law. In other words, "the statute facially restricts expressive activity by the class to which the [P]laintiff belongs"—which is enough for a First Amendment injury. *Bartlett*, 168 F.3d at 710 (cleaned up). Further, there is no genuine dispute that the Plaintiff would otherwise engage in political speech prohibited by South Carolina law. The chill imposed by state law on the Plaintiff's speech is objectively reasonable, particularly given that the Defendants have recently published advisory opinions threatening enforcement of relevant provisions. House Ethics Advisory Opinion 2017-13, p. 3. Injunctive relief is the only way to protect the speech of the Plaintiff and ensure that the Plaintiff will not face investigations and sanctions for that speech.[5]

*Second*, there is no adequate remedy at law for the deprivation of the Plaintiff's right to speak. "[M]onetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club*, 637 F.3d at 302.

*Third*, the balance of hardships and public interests—which merge when the government is a party—favor an injunction. *See Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020). The State has inflicted a stark hardship on the Plaintiff: the loss of its First Amendment rights. The Defendants are "in no way harmed" by an injunction that prevents the enforcement of an

---

[5] Moreover, "being subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (cleaned up). It is illegal for the Plaintiff to share its speech on an equal footing with other caucuses, which is another irreparable injury that justifies a permanent injunction. And given all of these ongoing injuries—caused by the Defendants' enforcement power and redressable by this action—the Plaintiff easily has standing, and the case is ripe.

unconstitutional burden on protected speech. *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). And because of how vital constitutional freedoms are to public life, the public is always served by the protection of First Amendment rights. *See Legend Night Club*, 637 F.3d at 303 ("[I]t is always in the public interest to protect First Amendment liberties." (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)); *Newsom*, 354 F.3d at 261 ("Surely, upholding constitutional rights serves the public interest."). The public is disserved when it is sequestered from the free marketplace of ideas. *Cf. Citizens United*, 558 U.S. at 356 (explaining that it "is unlawful" for the government to "use[] censorship to control thought" by "command[ing] where a person may get his or her information or what distrusted source he or she may not hear"); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas.").

## CONCLUSION

For these reasons, the Court **GRANTS** summary judgment for the Plaintiff. The Court **DECLARES** that the provisions of South Carolina law discriminating against legislative special interest caucuses violate the First and Fourteenth Amendments. The Court permanently **ENJOINS** the Defendants and their employees, agents, successors, and all others acting in concert or participating with them from enforcing these provisions, including S.C. Code Ann. §§ 2-17-10(21), 2-17-110(J), and 8-13-1333(C). **IT IS SO ORDERED.**