**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA FREEDOM CAUCUS, | |
| *Plaintiff*, | Civil Action No. 3:23-cv-00795-CMC |
| v. | |
| WALLACE H. JORDAN, JR., J. DAVID WEEKS, BETH E. BERNSTEIN, PAULA RAWL CALHOON, MICAJAH P. CASKEY, IV, NEAL A. COLLINS, JOHN RICHARD C. KING, ROBBY ROBBINS, J. TODD RUTHERFORD, AND LEONIDAS E. STAVRINAKIS, in their official capacities as members of THE HOUSE OF REPRESENTATIVES LEGISLATIVE ETHICS COMMITTEE, | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| *Defendants*. | |

Notwithstanding the Supreme Court's admonition that facial challenges to statutes are disfavored because they often rest on speculative harm and "factually barebones records," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (citing *Sabri v. United States,* 541 U.S. 600, 609 (2004)), Plaintiff South Carolina Freedom Caucus ("Plaintiff"), urges this Court to hurry the review of Plaintiff's challenge—without discovery or trial—to find unenforceable on their face legitimate and reasonable restrictions on legislative special interest caucuses enacted to prevent fraud and corruption. *See* Plaintiff's Motion for Summary Judgment, ECF No. 17 ("Plaintiff's Motion" or "Motion"). Plaintiff seeks this relief, not only by ignoring the legislative history of the challenged statutes, but by failing to meet its burden of establishing standing and by failing to provide facts to support Plaintiff's entitlement to such relief. In purported support for the proposition that there is no need for discovery, Plaintiff cites one of this Court's prior opinions, *Carolina Pride, Inc. v. McMaster*, 654 F. Supp. 2d 406, 409

(D.S.C. 2009). *See* ECF No. 19 at 1–2. However, as this Court is aware, unlike in *Carolina Pride*,[1] here Defendants expressly have stated their need for discovery at this stage of the case. *See* ECF Nos. 18 and 18-1. Because Plaintiff has no standing to challenge the constitutionality of the statutes facially, because there is a dearth of facts to support Plaintiff's entitlement to any relief, and because Plaintiff has ignored the legislative history of the challenged statutes, Plaintiff's Motion must be denied.

This Response in Opposition to Plaintiff's Motion ("Response") is submitted by Defendants, Wallace H. Jordan, Jr., J. David Weeks, Beth E. Bernstein, Paula Rawl Calhoon, Micajah P. Caskey, IV, Neal A. Collins, John Richard C. King, Robby Robbins, J. Todd Rutherford, and Leonidas E. Stavrinakis, in their official capacities as members of The House of Representatives Legislative Ethics Committee (collectively, "Defendants" or "Ethics Committee"). In support of this Response, Defendants submit herewith the Declarations of Jane Shuler, Representative Wallace H. Jordan, Jr., Representative David R. Hiott, Representative J. David Weeks, and Representative Micajah P. Caskey IV, attached as **Exhibits 1**, **2**, **3**, **4**, and **5**, respectively.

---

[1] The other case decided by this Court in Plaintiff's Reply (*see* ECF No. 19 at 4 (citing *Centennial LLC v. Becker*, No. 3:97-cv-1126, 2000 WL 35508748, at *6 n.5 (D.S.C. Nov. 14, 2000) (Currie, J.), *aff'd*, 23 F. App'x 181 (4th Cir. 2002))) was cited for the standard under Federal Rule of Evidence 56(d). Unlike the plaintiff in *Centennial LLC*, Defendants here submitted the appropriate declaration demonstrating specifically how additional discovery will rebut the movant's showing of the absence of a genuine dispute of material fact. *See* ECF No. 18-1. Also, the plaintiff in *Centennial LLC* had merely "idle speculation about missing or undisclosed documents" and "a vague hope that discovery might produce additional material facts," which was insufficient for the Court to license a "fishing expedition," *Centennial LLC*, at *7 n.5, and the same cannot be said for Defendants here given the record before the Court.

## PROCEDURAL HISTORY

Plaintiff has launched a challenge against certain statutory requirements and limitations that the Legislature has imposed on special interest legislative caucuses. Without citing specifically to all of the precise statutes it purports to challenge, Plaintiff has filed a three-count Complaint. *See* Compl., ECF No. 1. Count I appears to assert a challenge S.C. CODE ANN. § 2-17-10(21) and S.C. CODE ANN. § 8-13-1333(C)(1), alleging a violation of the First Amendment relating to limitations on legislative special interest caucuses' ability to solicit of contributions and make expenditures to influence the outcome of an election; Count II purports to challenge S.C. CODE ANN. § 8-13-1333(C)(1)'s disclosure requirements under the First Amendment; and Count III appears to challenge the above statutes under the Equal Protection Clause of the Fourteenth Amendment. *See* Compl. at ¶¶ 34–56, ECF No. 1. As such, it appears that Plaintiff has three main protestations: (1) that it, as a legislative special interest caucus, is subject to contribution and expenditure limitations, (2) that it must disclose all donors, no matter the amount of the donation, and (3) that it is treated differently than legislative caucuses.

On March 15, 2023, Plaintiff filed the instant Motion, arguing, among other things, that its statutory challenges were facial and discovery was unnecessary to adjudicate its claims. *See* ECF No. 17. On March 29, 2023, Defendants responded in opposition to Plaintiff's Motion with a supporting declaration and argued, pursuant to Federal Rule of Civil Procedure 56(d), that the Motion was premature and that fact discovery was indeed necessary in several areas. *See* ECF Nos. 18 and 18-1. Plaintiff replied to that Response on April 5, 2023. *See* ECF No. 19.

The Court scheduled a hearing on the Motion for May 11, 2023. *See* ECF No. 20. On April 12, 2023, Defendants filed their Answer and Affirmative Defenses. *See* ECF No. 21. In their Answer, Defendants noted that they had not yet filed a substantive response to Plaintiff's Motion

and sought clarification as to the scope of the hearing. *See id.* at 2 n.2. On April 14, 2023, the Court entered a Text Order clarifying that the Court "intends to address the merits of Plaintiff's motion for summary judgment as it does not appear fact discovery would aid in the court's determination of whether S.C. CODE ANN. § 2-17-10(21) violates the First Amendment." ECF No. 27. The Court granted until April 28, 2023, to file a substantive response to Plaintiff's Motion and noted that, at the hearing, the Court it would hear "substantive arguments and take into consideration at that time whether fact discovery will serve to clarify the legal issue at hand." *Id.* Pursuant to the Order, Defendants now submit this Response.

## LEGAL STANDARDS

### A.    The intermediate scrutiny standard applies to challenges to contribution and expenditure limits.

While Plaintiff does not directly categorize its challenges to S.C. CODE ANN. § 2-17-10(21) and S.C. CODE ANN. § 8-13-1333(C)(1) as attacking the contribution limits in Count I, these two statutes preclude legislative special interest caucuses from soliciting contributions, and, therefore, should be analyzed under the legal standards for challenges to contribution limits.

The United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), set "the standards that courts apply in cases challenging campaign finance regulations on First Amendment grounds." *Washington Post v. McManus*, 355 F. Supp. 3d 272, 289 (D. Md.), *aff'd*, 944 F.3d 506 (4th Cir. 2019). In doing so, the Supreme Court drew distinctions between different types of regulations "based on the degree to which each encroaches upon protected First Amendment interests." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 196–97 (2014) (discussing *Buckley*). Thus, while spending limits may be subject to a higher level of scrutiny,[2] the *Buckley* Court found that

---

[2] Should the Court decide that strict scrutiny applies to any of Plaintiff's claims, such claims still fail under that standard as well for the same reasons articulated herein.

"a limitation upon the amount that any one person or group may *contribute* to a candidate or political committee entails only a *marginal restriction* upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20 (emphasis added); *see also Washington Post*, 355 F. Supp. 3d at 290 (citing *Buckley*, 424 U.S. at 20) (finding that "contribution limits – *i.e.*, regulations limiting the amount of money a person or group may *contribute* to a candidate or political committee – were less worrisome" (alteration in original)). Also, while the Supreme Court in *Buckley* did not precisely articulate the standard for reviewing the constitutionality of contribution limits, "subsequent cases subjected these types of restrictions to a kind of intermediate scrutiny." *Washington Post*, 355 F. Supp. 3d at 290 (collecting cases).

Under this intermediate scrutiny standard, a contribution limitation is constitutional when it is "closely drawn to serve a sufficiently important interest, such as preventing corruption and the appearance of corruption." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 737 (2008) (cleaned up); *see also Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 466 (2001) (same). In applying this standard to contribution limit challenges, courts have "extended a measure of deference to the judgment of the legislative body that enacted the law." *Davis*, 554 U.S. at 737 (citing *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (plurality opinion); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 396–97 (2000); *Buckley*, 424 U.S. at 30). Similar to the standard for contribution limitations, "even a 'significant interference' with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 197 (cleaned up).

**B.    Plaintiff's disclosure challenge is subject to exacting scrutiny.**

Plaintiff's allegations in Count II dealing with disclosure requirements are subject to the "exacting scrutiny" standard. *The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681

F.3d 544, 546 (4th Cir. 2012) ("applying the 'exacting scrutiny' standard applicable to disclosure provisions"). Under this standard, the government must demonstrate only a "substantial relation" between the disclosure requirement and "sufficiently important government interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010).

### C.    Plaintiff's Equal Protection challenge is subject to rational basis review.

In Count III, Plaintiff alleges a violation of the Fourteenth Amendment's Equal Protection Clause, which states, in relevant part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. The Clause requires that similarly situated individuals be treated alike. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Under an Equal Protection analysis, courts generally hold that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id*. at 440. Indeed, upon rational basis review, a classification in a statute bears a strong presumption of validity. *See Lyng v. Automobile Workers*, 485 U.S. 360, 370 (1988). In fact, laws are "presumed to be constitutional under the equal protection clause for the simple reason that classification is the very essence of the art of legislation." *Moss v. Clark*, 886 F.2d 686, 689 (4th Cir. 1989) (citing *City of Cleburne*, 473 U.S. at 440). As such, "the challenged classification need only be rationally related to a legitimate state interest unless it violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

### D.    Standard for Summary Judgment

Even if Plaintiff were to meet the above-stated standards and could satisfy its burden on standing, Plaintiff is not entitled to relief on its claims because there remains a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "Conclusory allegations or

6

denials, without more, are insufficient to preclude granting the summary judgment motion." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). "Courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Plaintiff's allegations are conclusory at best, and, without sufficient discovery into the issues detailed herein, Plaintiff's Motion should be denied.

## ARGUMENTS

### I.    Plaintiff Lacks Standing to Bring its Claims Because It Has Not Established Injury in Fact Caused by the Ethics Committee.

This Court lacks subject matter jurisdiction over Plaintiff's claims because there is no actual case or controversy here. Plaintiff has not been injured and its alleged speculative injuries have no causal connection to any actions of the Ethics Committee. Article III's "case" or "controversy" requirement demands that a plaintiff demonstrates standing—meaning that the plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). To establish standing, a plaintiff first must demonstrate an "injury in fact" and must establish "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... traceable to the challenged *action of the defendant*, and not ... the result of the independent action of some third party not before the court.'" *Id.* (cleaned up and emphasis added). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. E. Ky.*

*Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). The plaintiff bears the burden of establishing standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, (2006).

Nowhere in its Complaint does Plaintiff allege that the Ethics Committee actually harmed Plaintiff in any way. Instead, Plaintiff's pleadings can be read as merely voicing fears of a hypothetical injury should the Ethics Committee find that Plaintiff has violated one of the challenged statutes. It bears noting here that, as discussed herein, Plaintiff is not an individual, but purports to be a legislative special interest caucus[3]—a creation of the very statutes it now appears to challenge.

Plaintiff acknowledges that the Ethics Committee is "responsible for enforcing the laws at issue," handling "ethics complaints and investigations," convening "formal hearings," and sanctioning "members found to be in violation of the rules, including with public reprimands and recommendations for expulsion and criminal prosecution." Compl. at ¶ 15, ECF No. 1. However, as discovery on this issue would confirm, no such enforcement has actually occurred against Plaintiff. To date, no complaint has been filed against Plaintiff (or its members), no investigation has commenced into Plaintiff's activities, no hearings have been held regarding Plaintiff's existence or activities, and the Ethics Committee has not sanctioned, administered a public

---

[3]S.C. CODE ANN. § 2-17-10(21) applies only to "two or more legislators who seek to be affiliated based upon a special interest." While "special interest" is not defined, the statute expressly states that this "may include, but is not limited to, a representation of sportsmen and women desiring to enhance and protect hunting, fishing, and shooting sports." *Id*. Therefore, Defendants do not concede that Plaintiff and its stated goals of promoting "conservative principles like the rule of law and equal protection for all citizens under the law" (Compl. at ¶14, ECF No. 1) are appropriately using this statute to organize itself as a legislative special interest caucus. It appears that Plaintiff is attempting to use the existing statutory scheme about which it complains to organize as a pseudo-political party. This is but one reason why Defendants submit that discovery is necessary to determine exactly what Plaintiff's "special interest" is and why it feels constrained to organize as a "legislative special interest caucus" when alternatives exist for the advancement of the causes its members claim they support.

reprimand, imposed a civil penalty, recommended expulsion, or referred for criminal prosecution any members of Plaintiff. *See* Declaration of Jane O. Shuler, ¶¶ 9, 10, **Exhibit 1**; Declaration of Wallace H. Jordan, Jr., ¶¶ 10, 11, **Exhibit 2**.

Nor has the Ethics Committee issued any advisory opinion concerning the South Carolina Freedom Caucus specifically or the prohibition on a legislative special interest caucus' ability to engage in "activity that would influence the outcome of an election or ballot measure." Shuler Decl. ¶¶ 7, 8, **Exhibit 1**. Indeed, the only Advisory Opinion cited by Plaintiff, House Legislative Ethics Committee Advisory Opinion 2017-13 (ECF No. 17-2), does not address the prohibition on a legislative special interest caucus' ability to engage in "activity that would influence the outcome of an election or ballot measure," as defined in S.C. CODE ANN. § 2-17-10(21). Instead, that Advisory Opinion, issued prior to Plaintiff's formation, concerns the ability of legislative special interest caucuses to receive meals, lodging, gifts, etc., from lobbyists, and does not address Plaintiff's purported concerns raised in its Complaint.

Here, Plaintiff has demonstrated no injury, notwithstanding its Prayer for Relief asking this Court to enjoin the Ethics Committee prospectively and requiring it "to treat legislative special interest caucuses the same as other legislative caucus committees." Compl., Prayer for Relief, ECF No. 1. Accordingly, this Motion should be denied for lack of standing.

## II. The Statutory Limitations on Soliciting Contributions and Engaging in Activity that Would Influence the Outcome of an Election Do Not Violate the First Amendment.

Plaintiff's Count I alleges that the statutory limitations on soliciting contributions in S.C. CODE ANN. § 2-17-10(21) and engaging in activity that would influence the outcome of an election or ballot measure in S.C. CODE ANN. § 8-13-1333 violate the First Amendment. *See* Compl. at ¶¶ 34–43, ECF No. 1. As will be discussed below, these statutes do not violate the First Amendment

9

because there is at least a sufficiently important government interest in imposing the restrictions, and the statutes are closely drawn to achieve these important legislative goals.

A.   **South Carolina history demonstrates the need for campaign finance regulation and the government's interest for such regulation, as does the legislative history of the statutes.**

In 1787, James Madison in Federalist No. 10 warned of the "mischiefs" of factions. James Madison, *Federalist No. 10*, LIBR. OF CONG. (Nov. 23, 1787), https://guides.loc.gov/federalist-papers/text-1-10#s-lg-box-wrapper-25493273. Madison defined a faction as a group of citizens who share a common passion or interest (*i.e.*, a legislative special interest caucus) that, if it were to be granted its ruling passion, would put the rights of other citizens at risk or would harm the society as a whole. *Id.* South Carolina's recent history reinforces that notion and evidences actual corruption in the South Carolina General Assembly as it relates to at least one group that previously appeared to operate as a form of legislative special interest caucus.

From the late 1970s until the early 1990s, the Fat and Ugly Caucus, which was comprised of about 40 legislators and akin to a modern-day legislative special interest caucus, coerced lobbyists to fund its Thursday lunches or face having the bill the lobbyists were supporting killed by members of the caucus. *See* Cindi Ross Scoppe, *Another Fat and Ugly Attempt to Shake Down Special Interests*, THE STATE, Apr. 5, 2005, at A8, https://infoweb.newsbank.com. In the 1990s, a federal investigation known as Operation Lost Trust led to the conviction of seventeen members of the Legislature—including a number of members of the Fat and Ugly Caucus—for a number of crimes, including bribery and extortion. *See HISTORY: Operation Lost Trust,* STATEHOUSE REPORT (Dec. 16, 2016), https://www.statehousereport.com/2016/12/16/history-operation-lost-trust-2/; Rodney Welch, *South Carolina gets D- grade in 2015 State Integrity Investigation*, THE CTR. FOR PUB. INTEGRITY (Nov. 9, 2015), https://publicintegrity.org/politics/state-politics/south-carolina-gets-f-grade-in-2012-state-integrity-investigation/; *see also United States v. Bailey*, 990

F.2d 119, 121–22 (4th Cir. 1993) (describing instances of impermissible *quid pro quo* arrangements by former South Carolina legislators). In the wake of and in direct response to the Lost Trust scandal, the Legislature passed the Ethics Reform Act of 1991, S.C. CODE ANN. §§ 8-13-100, *et seq*. Among other things, that Act expanded the size of the South Carolina Ethics Commission and gave it additional responsibilities to include lobbyist registration and disclosure, financial disclosure, campaign practices, and ethical rules of conduct.

In 2005, seventeen members of the South Carolina House introduced the initial version of the House Bill 3402 ("H. 3402"), which would have added "special legislative interest" as a potential type of "legislative caucus." *See* H.R. Journal, 116th Session, 710 (2005), https://www.scstatehouse.gov/sess116_2005-2006/hj05/01-27-05.doc; H. 3402, 116th Session, (Jan. 27, 2005), https://www.scstatehouse.gov/sess116_2005-2006/prever/3402_20050127.htm. The Legislature took its time with this bill, considering it over the course of more than a year, and only after adding several amendments, did the Legislature pass H. 3402. This Act allows for the creation of a "legislative special interest caucus"—a creature of legislative creation which is by statute both distinct and different from a "legislative caucus." *See* S.C. CODE ANN. § 2-17-10(11)(c); S.C. CODE ANN. § 2-17-10(21). Defendants themselves highlight this distinction, as Plaintiff asserts in the first paragraph of its Motion that, "South Carolina law bans legislative caucuses formed by certain speakers from engaging in core political speech, even as it permits favored caucuses—those formed around party, race, or gender—to engage in that speech." Motion at 1, ECF No. 17. Plaintiff insinuates that a "legislative special interest caucus" is legally a "legislative caucus" and that South Carolina law treats legislative special interest caucuses differently, depending upon which legislators compose their respective caucus. Both insinuations are factually inaccurate. By statute, a "legislative special interest caucus" is unique from a

"legislative caucus." S.C. CODE ANN. § 2-17-10(11)(c) (stating that "'legislative caucus' does not include a legislative special interest caucus as defined in Section 2-17-10(21)"); *see also* S.C. CODE ANN. § 8-13-1300(21) (stating that "'legislative caucus committee' does not include a 'legislative special interest caucus' as defined in Section 2-17-10(21)"). And there is no provision in S.C. CODE ANN. § 2-17-10(21) that would permit South Carolina to treat legislative special interest caucuses differently based on their member composition. Plaintiff's assertions to the contrary miss the mark entirely here. Of course, based on South Carolina's unfortunate recent history, it is completely understandable that the Legislature, with enough votes to overcome a veto, chose to place limitations on legislative special interest caucuses that would limit *quid pro quo* corruption and its very appearance.

The South Carolina Legislature's history of actual *quid pro quo* corruption, an indisputably shocking and embarrassing stain on the State's legislative history, supports the reasonable regulation of legislative special interest caucuses to limit *quid pro quo* corruption and its very appearance. *See Burson v. Freeman*, 504 U.S. 191, 209 (1992) (plurality opinion) ("Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."). This regulation treats all legislator viewpoints and speakers equally, as it applies to all legislators without regard for party, position, or content of the respective legislator's message, *see Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117, 125 (2011), and, as such, provides no basis for an Equal Protection challenge.

**B.     The State of South Carolina has a more than sufficiently important governmental interest in limiting contributions and expenditures to preserve the order and integrity of elections.**

State "government must play an active role in structuring elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 281 (4th Cir.

2008). These powers are essential in ensuring that elections "are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. The State of South Carolina has sufficiently important, even compelling, interests in preventing corruption and the appearance thereof, increasing transparency into the electoral process, and holding candidates, elected officials, and donors accountable. *See* Jordan Decl. ¶ 7, **Exhibit 2**; Declaration of David R. Hiott, ¶¶ 5–6, **Exhibit 3**; Declaration of J. David Weeks, ¶¶ 7–8, **Exhibit 4**.

By extension, South Carolina also has a sufficiently important government interest in regulating legislative special interest caucuses to limit *quid pro quo* corruption and its very appearance. U.S. Supreme Court precedent provides that an anti-corruption government interest limited to actual *quid pro quo* or the appearance thereof is a "sufficiently important governmental interest, which is all that is required for closely drawn scrutiny." *United States v. Danielczyk*, 683 F.3d 611, 618 (4th Cir. 2012) (internal citation omitted) ("Prevention of actual and perceived corruption and the threat of circumvention are firmly established government interests that support regulations on campaign financing."); *see also Nixon*, 528 U.S. at 390 ("Even without *Buckley*, there would be no serious question about the legitimacy of these interests" of preventing corruption and the appearance of it.); *McCutcheon*, 572 U.S. at 197 ("The primary purpose of [the Federal Elections Campaign Act] was to limit *quid pro quo* corruption and its appearance; that purpose satisfied the requirement of a 'sufficiently important' governmental interest.").

Here, the challenged statutes are clearly constitutional. A "legislator has no right to use official powers for expressive purposes." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011). The First Amendment does not confer "a right to use governmental mechanics to convey a message." *Id.* First, S.C. CODE ANN. § 2-17-10(21) prohibits "legislative special interest caucus[es from] engag[ing] in any activity that would influence the outcome of an election or

ballot measure." Such prohibition is supported by a sufficiently important government interest—preventing both *quid pro quo* corruption and the appearance of *quid pro quo* corruption in the election and ballot measure context, reducing the opportunity for legislators to act, not on behalf of the public at large, but on behalf of special interests or the legislators themselves. Further to that point, this statute is deliberately included in Title 2, Chapter 17, which deals with Lobbyists and Lobbying, in order to limit legislative special interest caucuses in the same way as lobbyists. Similarly, S.C. CODE ANN. § 2-17-110(J) prohibits lobbyists from providing "contributions" to legislative special interest caucuses. This is because, as courts have routinely noted, the potential for corruption with lobbyists because "lobbyists are paid to effectuate particular political outcomes." *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 715 (4th Cir. 1999) (finding "a genuine risk of both actual corruption and the appearance of corruption" because "the temptation to exchange 'dollars for political favors' can be powerful.) (citing *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm*., 470 U.S. 480, 497 (1985)).

Second, S.C. CODE ANN. § 8-13-1333(C) prohibits legislative special interest caucuses from soliciting contributions as defined in S.C. CODE ANN. § 8-13-100(9) (to influence the outcome of an election) and limits how such caucuses may solicit funds from the general public. As with the prior statute, such prohibitions also are supported by a sufficiently important government interest as they significantly reduce or remove the appearance of *quid pro quo* corruption. To that point, "the First Amendment allows for regulations of solicitation—that is, speech 'requesting or seeking to obtain something' or '[a]n attempt or effort to gain business.'" *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1473 (2022).

For all of these reasons, the State has at least sufficiently important interests in limiting legislative special interest caucuses.

14

### C.     The statutory limits on campaign contributions and expenditures are closely drawn to achieve the important legislative goals discuss above.

"It is inevitable . . . that in exercising its authority, the government will impose burdens of one kind or another on participants in the election process, be they candidates, campaign committees, political action committees, ballot initiative petitioners, or voters." *Washington Post*, 355 F. Supp. 3d at 289. As such, the First Amendment allows the government to "impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also McCutcheon*, 572 U.S. at 218 (requiring "a means narrowly tailored to achieve the desired objective" for aggregate, contribution limits to political candidates and committees).

Notably, legislative special interest caucuses were created by statute and neither Plaintiff, nor anyone else, has *the right* to be a legislative special interest caucus. Plaintiff has voluntarily elected to register itself as a legislative special interest caucus, and, therefore, subjected itself to the confines that the Legislature chose to implement on such groups. Indeed, the Legislature has a number of rules and policies to govern its members, such as those commanding decorum and other rules governing speech on the House floor.[4]

Here, the South Carolina statutory provisions limiting contributions made to, and expenditures by, legislative special interest caucuses do not violate the First Amendment because

---

[4] For example, during the nomination of Jeff Sessions for Attorney General, Senate Majority Leader Mitch McConnell cut Rep. Elizabeth Warren's speech short pursuant to Rule XIX and Rep. McConnell explained, "She was warned. She was given an explanation. Nevertheless, she persisted." Daniel Victor, '*Nevertheless, She Persisted': How Senate's Silencing of Warren Became a Meme*, The New York Times, https://www.nytimes.com/2017/02/08/us/politics/elizabeth-warren-republicans-facebook-twitter.html (Feb. 7, 2017).

they are narrowly tailored and allow for ample reasonable alternatives for Plaintiff to engage in political speech. Specifically, S.C. CODE ANN. § 2-17-10(21), S.C. CODE ANN. § 8-13-1333(C), and S.C. CODE ANN. § 2-17-110(J) restrict legislative special interest caucuses' activities only to the extent appropriate to advance South Carolina's important government interests. First, S.C. CODE ANN. § 2-17-10(21) prohibits legislative special interest caucuses only from activities that "would *influence the outcome of an election* or ballot measure," which leaves intact all manner of other activities not specifically restricted by other law. *Id.* (emphasis added).

Second, S.C. CODE ANN. § 8-13-1333(C)(1) similarly restricts solicitation only of "contributions as defined in Section 8-13-100(9)." In that section, "contribution" is defined as "a gift, subscription, loan, guarantee upon which collection is made, forgiveness of a loan, an advance, in-kind contribution or expenditure, a deposit of money or anything of value made to a candidate or committee … *for the purpose of influencing an election* …" S.C. CODE ANN. § 8-13-100(9) (emphasis added). Again, this is a narrow purpose for which legislative special interest caucuses are limited. Plaintiff, like any other legislative special interest caucus, is allowed to raise and spend money freely for other purposes. *See* S.C. CODE ANN. § 8-13-1333(C)(1) (allowing legislative special interest caucuses to "solicit funds from the general public for the limited purpose of defraying mailing expenses, including cost of materials and postage, and for members of the legislative special interest caucus to attend regional and national conferences").

In addition, Plaintiff may respond to whatever "misleading anonymous attacks" about which it complains, so long as it does not do so in a manner that influences the outcome of an election. ECF No. 17-1 at 7. In other words, it is clear from the language of the statutes that these limitations are narrowly tailored to serve the governmental interests discussed above. Further, discovery would show that Plaintiff does indeed have the ability to raise and spend money for

purposes other than influencing the outcome of an election, further showing that these statutes are narrowly tailored in practice.

Third, S.C. CODE ANN. § 2-17-110(J) prohibits "[a] lobbyist, a lobbyist's principal, or a person acting on behalf of a lobbyist or a lobbyist's principal . . . [from] offer[ing] or provid[ing] contributions or any other type of funds or financial assistance to a legislative special interest caucus as defined in Section 2-17-10(21)." Such prohibition is supported by a sufficiently important government interest—limiting *quid pro quo* corruption and its very appearance—and "serve[s] the state interests," as lobbyists are "prone to corruption and therefore especially susceptible to public suspicion of corruption." *Preston v. Leake*, 660 F.3d 726, 737 (4th Cir. 2011). Accordingly, in light of South Carolina's history of *quid pro quo* corruption as related to lobbyists and legislative special interest caucuses, the prohibition in S.C. CODE ANN. § 2-17-110(J) is not overbroad, even with no limiting exceptions, and "is closely drawn to meet the perceived problem." *Preston*, 660 F.3d at 737 (Based on "North Carolina's stated experience with corruption and its decision to impose the 'highest standards,' we find no reason to second-guess the legislative judgment that a ban on all contributions from lobbyists was the best response."). For these reasons, a legislative special interest caucus may not accept funds from a lobbyist. S.C. CODE ANN. § 8-13-1333(C)(1).

Finally, there are certainly a number of reasonable alternatives available to Plaintiff to conduct the type of activity in which it and its members indicate in the Complaint it wishes to engage. Plaintiff's members could form a political action committee ("PAC") under federal law to fundraise, contribute, and influence the outcome of an election or ballot measure. Plaintiff and its members could register and identify as a political party and operate under the same contribution limits and disclosure limits to which political parties are subject. Plaintiff is also free to organize

as a 501(c)(3), 501(c)(4), or a political organization under IRC § 527. As such, there are several reasonable alternatives for Plaintiff to organize, yet its members voluntarily chose to organize as a legislative special interest caucus, knowing that to do so would subject Plaintiff to certain limitations created by the very Legislature of which they are members. the requirements of such a group.

### III.     The Disclosure Requirements in § 8-13-1333(C)(1) Serve Sufficiently Important Government Interests and have a Substantial Relation to Those Goals.

The disclosure requirements found in 8-13-1333(C)(1) provide accountability and transparency to the public into campaigns and elections, which are certainly important government interests, and also guard against the "mischief" of legislative special interest caucuses. The Supreme Court has explained in several cases that such disclosure requirements are justified by important governmental interests, such as "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196 (2003) (rejecting a facial challenge to disclosure requirements). Further, in *Citizens United*, the Court explained that "the public has an interest in knowing who is speaking about a candidate." *Citizens United*, 558 U.S. at 369. "This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id.* at 371. These are all certainly important government interests.

While such "disclaimer and disclosure requirements may burden the ability to speak, they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." *Id.* at 366 (cleaned up). However, such disclosure requirements "are not as burdensome on speech as are limits imposed on campaign activities or limits imposed on contributions to and expenditures by campaigns." *The Real Truth About Abortion, Inc.*, 681 F.3d at 548. Indeed, the Supreme Court

18

has noted that "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley,* 424 U.S. at 68, 96; s*ee also Fed. Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238, 262 (1986). The Supreme Court has recognized routinely that because disclosure requirements occasion a lesser burden on speech, it is constitutionally permissible to require disclosure for a wider variety of speech than mere electioneering. *See, e.g., United States v. Harriss*, 347 U.S. 612, 625 (1954) (upholding disclosure and registration requirements on lobbyists); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n. 32 (1978) (observing that "[i]dentification of the source of [ballot referendum] advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected").

The disclosure requirements applicable to South Carolina legislative special interest caucuses are less burdensome than contribution and expenditure limitations and have a substantial relation to the same or very similar important governmental interests. Accordingly, these requirements also do not violate the First Amendment.

**IV.    Plaintiff Cannot Base an Equal Protection Claim on the Statutory Limitations on Soliciting Contributions and Engaging in Activity that Would Influence the Outcome of an Election Because Plaintiff is Not a Suspect Class and the Limitations Are Rationally Related to a Legitimate State Interest.**

Plaintiff alleges, in Count III, that South Carolina law discriminates against "disfavored speech," presumably that of legislative special interest caucuses, in violation of the Equal Protection Clause of the Fourteenth Amendment. *See* Compl. at ¶¶ 49–56, ECF No. 1. Plaintiff broadly alleges that the Equal Protection Clause "mandates equal treatment without discrimination or preference." *Id.* at ¶ 50.

However, this principle is not, and cannot be, absolute because it is a "practical necessity that most legislation classif[y] for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Under well-settled precedent, unless a statute "involves a discernible fundamental interest nor affects any protected class with particularity, the relatively relaxed 'rational-basis' standard should be applied in determining whether the statute violates the Equal Protection Clause." *Watkins v. Cantrell*, 736 F.2d 933, 945 (4th Cir. 1984). In applying this deferential standard, courts generally accord the legislation a "strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993).

Plaintiff is not a protected class and there is no fundamental right to be a legislative special interest caucuses because, in South Carolina, these are solely creations of statute. There is no First Amendment or any other federal or state constitutional right to organize as or become a member of a legislative special interest caucus. As such, a legislative special interest caucus cannot claim that it constitutes a suspect class as it is not organized based on race, religion, national origin, or alienage. Indeed, Plaintiff admits that it is organized around the special interest of promoting "conservative principles like the rule of law and equal protection for all citizens under the law." Compl. at ¶ 14, ECF No. 1.

Disparate treatment between legislative special interest caucuses and other kinds of entities may "reflect a judgment by [the Legislature] that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process." *See California Med. Ass'n v. Fed. Elec. Comm'n*, 453 U.S. 182, 201 (1981). Indeed, South Carolina law treats a number of political entities differently. This is illustrated by the chart below on contribution limits:

| South Carolina contribution limits as of May 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Individuals | Single candidates committees | PACs | Legislative caucus committee | Political party | Super PACs | Corporations | Unions |
| Statewide candidate (e.g., governor) | $3,500 | $0 | $3,500 | $50,000 | $50,000 | $0 | $3,500 | $3,500 |
| Senate candidate | $1,000 | $0 | $1,000 | $5,000 | $5,000 | $0 | $1,000 | $1,000 |
| House candidate | $1,000 | $0 | $1,000 | $5,000 | $5,000 | $0 | $1,000 | $1,000 |
| PAC | $3,500 | $0 | $3,500 | $3,500 | $3,500 | $0 | $3,500 | $3,500 |
| Legislative caucus committee | $3,500 | surplus funds | $3,500 | $3,500 | $3,500 | $0 | $3,500 | $3,500 |
| Party committees | $3,500 | surplus funds | $3,500 | $3,500 | $3,500 | $0 | $3,500 | $3,500 |
| Ballot measures | $3,500 | surplus funds | $3,500 | $3,500 | $3,500 | $0 | $3,500 | $3,500 |

*Campaign finance requirements in South Carolina*, Ballotpedia, https://ballotpedia.org/Campaign_finance_requirements_in_South_Carolina (last visited Apr. 19, 2023).

As shown in the chart above, a number of individuals and associations are treated differently. However, these are legitimate differences in classifications that are rationally related to the same important government interests discussed above. Therefore, for the same reasons, Plaintiff's Equal Protection claim fails.

## V.    Discovery Is Required on a Number of Issues, Precluding Summary Judgment at this Early Stage.

Seemingly ignoring the Rule 56(d) declaration that Defendants' submitted (ECF No. 18), Plaintiff argues that the Ethics Committee has not specifically articulated what material facts it hopes to obtain through discovery and why such facts would have any relevance to this case. *See* ECF No. 19 at 15. Plaintiff also suggests that the Fourth Circuit's decision in *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013), "has no purchase here." ECF No. 19 at 15. Plaintiff attempts casually to brush aside

binding precedent where the *en banc* Fourth Circuit required discovery despite plaintiffs' assertions "that the court could 'very clearly rule as a facial matter,' looking solely to the Ordinance, its legislative history, and the pertinent case law." *Greater Baltimore,* 721 F.3d at 276. Plaintiff suggests that this Court do the same, despite the fact that the Ethics Committee has articulated what discovery is needed and why. *See* ECF Nos. 18 and 18-1. To meet Plaintiff's charges, the Ethics Committee is entitled to discovery at least on: the issue of standing and on the cognizable harms suffered by Plaintiff (if any); how Plaintiff is organized, including what its "special interest" actually is; how Plaintiff currently operates, fundraises, and spends money; what "attacks" Plaintiff has faced and why it feels it cannot respond to those alleged attacks.

Indeed, Plaintiff has not identified with any specificity the alleged "misleading anonymous attacks" its members have experienced or what expenditures Plaintiff contends it is prevented from disbursing to rebut the alleged "misleading anonymous attacks" based upon the current statutory law. ECF No. 17-1 at 7. Plaintiff also fails to recognize that it is able to "solicit funds from the general public for the limited purpose of defraying mailing expenses, including cost of materials and postage, and for members of the legislative special interest caucus to attend regional and national conferences." S.C. CODE ANN. § 8-13-1333(C)(1). It is unclear on this record whether Plaintiff is incurring and defraying mailing expenses in order to rebut the alleged "misleading anonymous attacks," and Plaintiff has failed to demonstrate how and why it cannot defend itself against these alleged attacks through activities allowed it by statute.

Further, it appears that Plaintiff *does* fundraise, receive contributions, and speak on political issues through the State Freedom Caucus Network. For example, the State Freedom Caucus sent out emails on behalf of Plaintiff with disclaimer PAID FOR BY STATE FREEDOM CAUCUS ACTION. *See* Declaration of Micajah P. Caskey, IV, ¶ 9, **Exhibit 5**. Numerous ads also

have been paid for on behalf of Plaintiff. Further, Plaintiff's Vice Chair Representative Robert J.

"RJ" May III recently gave an interview to a local news outlet in which he states that the members

of Plaintiff do not have staff and do not have lawyers on retainer. *Id.,* ¶ 7. In fact, Plaintiff has filed

this lawsuit as well as two other lawsuits.[5] It thus appears that Plaintiff does in fact have the ability

to speak on political issues through seemingly unregulated money. These are all areas in which

discovery is required to determine whether or not Plaintiff is injured and if there is a genuine

dispute of material fact in these areas.

**VI.** **H. 3402 Contains No Severability Provision, so Invalidating the Anti-Corruption Protections of the Act Would Frustrate the Intent of the Legislature.**

H. 3402 does not contain a severability clause. Severability is a matter of state law. *Leavitt*

*v. Jane L.*, 518 U.S. 137, 139 (1996); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d

204, 238–39 (4th Cir. 2016) ("State law governs our severability analysis."). In South Carolina,

the "test for severability is whether the constitutional portion of the statute remains complete in

itself, wholly independent of that which is rejected, and is of such a character that it may fairly be

presumed the legislature would have passed it independent of that which conflicts with the

constitution." *Joytime Distributors & Amusement Co. v. State*, 338 S.C. 634, 648-49, 528 S.E.2d

647, 654 (1999); *see also Murray v. Kaple*, 66 F. Supp. 2d 745, 750 (D.S.C. 1999) (applying South

Carolina law, "the test for severability is to determine whether or not the Legislature would have

passed the residue independently of that which is void."). Applying this test, the Supreme Court

of South Carolina has held that "to sever only part of the unconstitutional act would require this

Court to go beyond its proper role and to intrude into the province of the legislature." *Am.*

*Petroleum Inst. v. S.C. Dep't of Revenue*, 382 S.C. 572, 578, 677 S.E.2d 16, 19, (2009). The Court,

---

[5] *See South Carolina Freedom Caucus v. School District of Charleston County, et al*., Civil Action No. 2022CP1005451, and *South Carolina Freedom Caucus v. School District of Lexington County, et al*., Civil Action No. 2022CP3203931.

in an opinion written by the Honorable Justice Pleicones, stated that to "choose which portion [of a statute] to excise and which to keep would require the Court to usurp the prerogative of the General Assembly and thus act as a super-legislature." *Id.* at 579. Similarly, the Honorable Chief Justice Toal wrote in a concurrence that when the legislature amends a statute to specifically include certain language, "it is highly unlikely that the legislature would have enacted this statute absent the stricken language." *Town of Mount Pleasant v. Chimento*, 401 S.C. 522, 537, 737 S.E.2d 830, 840 (2012) (Toal, C.J., concurring). Because of that, the Court could not sever the language at issue "without striking the provision in its entirety." *Id.* at 537, 737 S.E.2d at 839.

As noted above, the South Carolina Legislature, over the course of more than a year, actively considered and ultimately passed as amended H. 3402, which includes S.C. CODE ANN. § 2-17-10(21) and 8-13-1333(C). *See* H. 3402, 116th Session, https://www.scstatehouse.gov/billsearch.php?billnumbers=3402&session=116&summary=T&PRINT=1 (last visited Apr. 21, 2023). In its final version of H. 3402, the Legislature greatly reduced the privileges initially first proposed for legislative special interest caucuses in the initial version of H. 3402—and it appears Plaintiff seeks by this lawsuit to reverse that reduction. The legislative history indicates that the Legislature would not have passed the H. 3402 without the various anti-corruption protections and restrictions found in the final version of H. 3402. *See* Hiott Decl., ¶ 7, **Exhibit 3**; *see also Doe v. State*, 808 S.E.2d 807, 811 n.6 (S.C. 2017) (describing that legislative history may include "the historical evolution of the statute at issue").

Therefore, should this Court determine that it must invalidate any restriction passed in H. 3402, all subsections of those statutes must be invalidated as well. While this would include removing all language in S.C. CODE ANN. § 2-17-10(21) allowing for the creation and existence

of legislative special interest caucuses, such an invalidation would be necessary to appropriately recognize the full legislative intent undergirding the challenged Act.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion for Summary Judgment because Plaintiff has failed to establish standing to assert its claims. Beyond standing, the State has sufficiently important government interests and the statutes at issue are closely drawn, even narrowly tailored, to those interests. Discovery into these issues would confirm Defendants' positions herein and mandate that Plaintiff's Motion for Summary Judgment ultimately be denied with prejudice.

Respectfully submitted,

s/ *Susan P. McWilliams*
Susan P. McWilliams (Fed. Bar No. 3351)
smcwilliams@maynardnexsen.com
Mark C. Moore (Fed. Bar No. 4956)
mmoore@maynardnexsen.com
Michael A. Parente (Fed. Bar No. 13358)
mparente@maynardnexsen.com
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.771.8900

*Counsel for Defendants Wallace H. Jordan, Jr., J. David Weeks, Beth E. Bernstein, Paula Rawl Calhoon, Micajah P. Caskey, IV, Neal A. Collins, John Richard C. King, Robby Robbins, J. Todd Rutherford, and Leonidas E. Stavrinakis, in their official capacities as members of The House of Representatives Legislative Ethics Committee*

April 28, 2023

Columbia, South Carolina